IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**LINDA WATERS, et al.**,                    Case Number 3:12 CV 732

    Plaintiffs,                    Judge Jeffrey J. Helmick

     v.                    REPORT AND RECOMMENDATION

**PERKINS LOCAL SCHOOL DISTRICT
BOARD OF EDUCATION, et al.**,

    Defendants.                    Magistrate Judge James R. Knepp II

## INTRODUCTION

Linda Waters and Patrick Waters (individually referred to as "Linda" and "Patrick", collectively "Plaintiffs") brought this action on behalf of their two minor sons, NW1 and NW2, alleging certain constitutional violations and federal and state law claims against Defendants Perkins Local School District Board of Education ("Board" or "District"), and Superintendent James Gunner ("Gunner"), Principal Stephen Finn ("Finn"), and Principal Dean Janitzki ("Janitzki") in their individual and official capacities (collectively referred to as "Defendants").

This case arises from events which occurred while NW1 was in fifth, sixth, and seventh grades at Meadowlawn Elementary School ("Meadowlawn") and Briar Middle School ("Briar") during the 2008-2009, 2009-2010, and 2010-2011 school years; and while NW2 was in second and third grades at Meadowlawn during the 2008-2009 and 2009-2010 school years. Meadowlawn and Briar are schools located within Perkins Local School District. During the relevant time period, Gunner was the Superintendent of Perkins Local School District, Janitzki was Principal at Meadowlawn, and Finn was the Principal at Briar.

Plaintiffs allege NW1 and NW2 suffered harassment by other students that deprived them of certain constitutional rights. They also contend Defendants had knowledge of the harassment

but failed to respond effectively. Specifically, Plaintiffs allege: constitutional violations under the due process and equal protection clauses (Doc. 1, ¶¶36-41); § 1983 custom and policy claims (Doc. 1, ¶¶ 42-44); racially motivated harassment/hostile environment pursuant to Title VI of the Education Amendments of 1972, 42 U.S.C. § 2000 (d) (Doc. 1, ¶¶ 45-47); and state law negligence (Doc. 1, ¶¶ 48-50).

Defendants filed a Motion for Summary Judgment on all counts. (Doc. 35). Plaintiffs filed a Response (Doc. 35), and Defendants filed a Reply (Doc. 43). The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367. This case was referred to the undersigned for the filing of a Report and Recommendation pursuant to Local Rule 72.2. (Non-document entry dated April 9, 2012).

For the reasons explained below, the undersigned recommends granting Defendants' Motion for Summary Judgment on all counts.

## FACTUAL BACKGROUND

Because this case is before the Court pursuant to a motion for summary judgment, any disputed facts are set forth below in the light most favorable to Plaintiffs. *Patterson v. Hudson Area Sch.*, 551 F.3d 438, 439 (6th Cir. 2009); *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001).

### *Facts Pertaining to NW2*

NW2 is the younger of Plaintiffs' two sons and attended Meadowlawn for second, third, and fourth grades. (NW2, Tr. 8).[1] During second and third grades, NW2 was in a multi-age classroom with students from both grades. (NW2, Tr. 9). Christa Hartung ("Hartung") was his

---

1. The Court references parties' statements from their depositions with their name followed by the page or transcript number.

teacher and Defendant Janitzki was the Principal at Meadowlawn during this time. (NW2, Tr. 9). Plaintiffs claim NW2 was bullied during second and third grades and identified Student 9[2] as the sole perpetrator.[3] (NW2, Tr. 27-29).

**<u>Student 9</u>**

Student 9 was classified as a student with a disability and educated under an Individualized Education Program (IEP) – a behavioral and educational plan intended to accommodate Student 9's disability. (Janitzki, Tr. 16-17; Doc. 36-1). Student 9's IEP for the 2008-2009 school year revealed behavior consistent with Attention Deficit/Hyperactivity Disorder (ADHD), as he was "prone to drawing attention to himself with loudness, inappropriate behavior and impulsive aggressiveness toward others." (Doc. 36-1). While he was making progress in structured settings, he needed "reminders, in unstructured settings [] to make appropriate behavior choices with peers." (Doc. 36-1). The IEP also noted Student 9 had difficulty regulating his own behavior and recognizing personal space, social cues, and socially appropriate behavior. (Doc. 36-1).

Hartung first spoke with Janitzki about Student 9 during the middle of the 2008-2009 school year because Student 9 was being rambunctious, impulsive, and making people feel uncomfortable. (Janitzki, Tr. 13-14, 17). At that time, Hartung addressed those concerns by putting Student 9 in places where he was not in close proximity to other students. (Janitzki, Tr.

---

2. Students are identified by number as indicated on the key provided by the parties. (Ex. 20, Doc. 26-3). Student M is not identified on the key. However, based on the parties' reference to the record, it is clear to the Court that Student M is M.S.
3. The Court acknowledges a snack-stealing incident which occurred around October 2008 (Doc. 26-1) and the pejorative pursuit of NW2 by two female peers on the playground (Hartung, Tr. 75-77). However, both incidents were isolated and extraneous.

19). Janitzki felt Hartung addressed Student 9's behavior properly and did not consider the behavior bullying because it "was just his demeanor." (Janitzki, Tr. 19).

At some point, Student 9 began touching other students' lunch trays. (Janitzki, Tr. 24-25). Hartung informed Janitzki she addressed this by placing Student 9 at a corner seat near two or three adults. (Janitzki, Tr. 25). Student 9 then started being "a little too" aggressive in the hallways. (Janitzki, Tr. 26). Hartung responded by placing Student 9 either at the front or back of the line and releasing him early at the end of the day so he could get to his locker without pushing other children away. (Janitzki, Tr. 26-28).

### Second Grade (2008-2009)

Linda frequently volunteered in Hartung's classroom and the two had a friendly relationship. (Linda Vol. I, Tr. 13; Hartung, Tr. 21, 23-24). Plaintiffs' issue with Student 9 primarily involved his behavior during unstructured time at lunch, recess, and in the hallway. (Hartung, Tr. 27; Ex. 25, Doc. 26-8; Ex. 33, Doc 26-16). NW2 described Student 9 as "kind of" a friend but said his behavior became aggressive on the playground. (NW2, Tr. 10). A December 2008 email exchange between Linda and Hartung revealed the first incident between the two boys. (Ex. 24, Doc. 26-7). In the email, Linda writes, "[NW2] wants to talk to you about [Student 9]. I'd prefer to have him tell you about it rather than me. It isn't anything really bad and I think [NW2] considers [Student 9] to be a friend." (Ex. 24, Doc. 26-7). Hartung replied that Student 9 was acting out because he could not contain his excitement about Christmas; nevertheless, she said she would work on controlling his behavior. (Ex. 24, Doc. 26-7).

In February 2009, NW2 reported Student 9 "slugged him and some of the other boys in the stomach during recess." (Ex. 25, Doc. 26-8). According to Linda, NW2 had "almost daily stories" about Student 9's behavior. (Ex. 25, Doc. 26-8). Linda acknowledged she was "not sure

4

if it was impacting [NW2] more than the other kids . . . or if it [was] impacting the kids equally."
(Ex. 24, Doc. 26-7; Ex. 25, Doc. 26-8). Hartung indicated that many of the children were
frustrated with Student 9's behavior, but his classroom behavior had improved and she was
working on getting Student 9 help during unstructured time. (Ex. 25, Doc. 26-8). She also made
sure the students knew to tell her if anyone was touching them inappropriately at any time. (Ex.
25, Doc. 32-7).

    In April 2009, Linda informed Janitzki and Hartung that Student 9 punched NW2 in the
stomach in the hallway between lunch and recess. (Ex. 33, Doc. 26-16). Linda said she was
concerned that "Student 9's behavior [was] creating stress for other children (especially [NW2])
and . . . compromising safety." (Ex. 33, Doc. 26-16).  Hartung thanked Linda for bringing this
their attention and indicated she would "keep trying." (Ex. 33, Doc. 26-16).

    On June 9, 2009, Linda emailed Hartung and expressed general frustration with "how
behavior [was] managed on the playground and during recess." (Ex. 35, Doc. 26-18). Linda said,
"I can't tell you the times that both of my children have come home with torn clothes [and]
scraped knees . . . because of them being tackled when playing basketball, shoved when playing
tag, etc." (Ex. 35, Doc. 26-18). However, there were no further complaints involving NW2 or
Student 9 for the remainder of the school year. (Ex. 34, Doc. 26-17; Ex. 25, Doc. 26-18).

    Throughout second grade, NW2 recalled that Student 9 was "really hyper" and would
push him and other boys down on the playground. (NW2, Tr. 10-12). At times, NW2 would tell
Hartung about Student 9's behavior after recess, which she addressed by discussing it with the
class. (NW2, Tr. 13-15). At other times, NW2 told the supervising teacher on the playground,
who would try and redirect Student 9 or send him inside. (NW2, Tr. 22-23). After school, NW2
indicated he would do homework, watch television, and play outside with friends. (NW2, Tr. 19-

5

22). However, NW2 said sometimes he would cry after school because he was so stressed out about Student 9. (NW2, Tr. 19-20). NW2 successfully completed second grade and enjoyed his summer break. (NW2, Tr. 22).

**Third Grade (2009-2010)**

NW2 returned to Hartung's class for third grade. Based on Linda's concern that the playground was too rough the prior year, Janitzki had assigned a second, paid playground monitor for the new school year. (Janitzki, Tr. 30-32). Nevertheless, in September 2009, NW2 emailed Hartung and said Student 9 was "making [him] feel mad at recess most days." (Doc. 25-1). He was frustrated because Student 9 would "ask him the same things over and over again." (Doc. 25-1). NW2 also said Student 9 "[was] really wild and trie[d] to grab [him] or push him away from other kids that [he was] playing with." (Ex. 1, Doc. 25-1).

At some point, Hartung asked Janitzki to talk to Student 9 about his behavior, which he did. (Janitzki, Tr. 34, 36-37). Janitzki also had Student 9 participate as a model in his bi-weekly meeting with the students about behavior. (Janitzki, Tr. 34-35, 38).

On a Friday evening in early November 2009, Patrick emailed Janitzki and claimed the "situation with [Student 9] on the playground [was] AGAIN getting much worse." (Ex. 9, Doc. 28-4). When Janitzki had not responded by Sunday evening, Patrick emailed and said, "[t]his is my second request for a meeting with you regarding the repetitive intolerable behavior" of Student 9. (Ex. 3, Doc. 28-3). In the same email, Patrick acknowledged Hartung had "been wonderful, and she [had] done everything she possibly [could] to thwart [Student 9's] acting out" but he needed further management to protect the class "from a hostile environment." (Ex. 8, Doc. 28-3).

6

Janitzki responded, indicated he had been out the prior week, and scheduled a meeting. (Ex. 9, Doc. 28-4). However, before the meeting occurred, NW2 testified Student 9 had been chasing him during a game of tag at recess, pushed him down, punched him in the butt, and bit his leg. (NW2, 23-24, 28). The bite did not require medical attention and his skin was not broken, but NW2 said no one at school looked at the bite-mark. (NW2, Tr. 25-26; Janitzki, Tr. 38).

After recess, NW2 told Hartung about the biting incident. (NW2, Tr. 25). In turn, Hartung informed Janitzki and he asked a group of boys who witnessed the incident to tell him what happened. (Janitzki, Tr. 39). Janitzki's investigation revealed the boys were playing freeze tag and "[t]hey all got a little too close and somebody fell and four guys fell on top of one another." (Janitzki, Tr. 39). When Janitzki asked NW2 whether he thought Student 9 bit him on purpose he said, "I don't know." (Janitzki, Tr. 39-40). Nevertheless, Janitzki brought Student 9 to his office and gave him a one day out-of-school suspension. (Janitzki, Tr. 40). Student 9 maintained that it was an accident but Janitzki stuck to the suspension. (Janitzki, Tr. 40). Linda had a conference scheduled with Hartung that same day and became aware of the incident when she arrived. (Janitzki, Tr. 41-42; Linda Vol. 1, Tr. 157).

The next day, Plaintiffs met with Janitzki for their previously scheduled meeting. (Janitzki, Tr. 42). During the meeting, Plaintiffs presented Janitzki with a copy of the Ohio Department of Education's recommendations on bullying, harassment, and intimidation. (Linda Vol. I, Tr. 159-60). At this point, according to Janitzki, Plaintiffs accused him of violating the law and said he could be jailed. (Janitzki, Tr. 43). Plaintiffs said they were dissatisfied with Janitzki's response about how he would handle future discipline when these incidents occurred. (Linda Vol. 1, Tr. 160-61). Their dissatisfaction was compounded by the fact that Plaintiffs were

unaware of how Janitzki disciplined Student 9, as he was required by law to protect student privacy pursuant to the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232g ("FERPA"). (Janitzki, Tr. 44; Linda Vol. 1, Tr. 160-61).

Janitzki asked Plaintiffs what they wanted from him. (Janitzki, Tr. 44). Plaintiffs said they wanted their son to be safe and Student 9's behavior controlled. (Janitzki, Tr. 41-45; Linda Vol. 1, 159-163). Linda filed a police report regarding the biting incident after she found out Janitzki had not. (Ex. 10, Doc. 28-5).

In addition to an out of school suspension, Gunner approved Janitzki's request for a full-time aide for Student 9 whenever he was outside the classroom. (Janitzki, Tr. 46). Until the aide was assigned, Janitzki did not permit Student 9 to be on the same playground as NW2. (Janitzki, Tr. 45-46).

NW2 recalled that Student 9 was suspended. (NW2, Tr. 28, 38). After that, NW2 said Student 9 was still "hyper" but he never touched him again. (NW2, Tr. 25-27). However, in January 2010, Linda emailed Hartung to inform her Student 9's behavior in the classroom created stress for NW2 and she wanted to make sure they were separated during group projects. (Ex. 54, Doc. 26-37). Linda also wanted to talk to Student 9's special education teacher to explain the impact Student 9's behavior had on NW2, which Linda described as "annoying, [] hyper, [and] impulsive." (Ex. 54, Doc. 26-37; Linda Vol. 1, Tr. 198). Hartung responded that NW2 seemed happy at school and she even noticed NW2 and Student 9 chatting at times. (Ex. 54, Doc. 26-37). Nevertheless, Hartung said she would talk to the boys and explain to them that being together on group projects was not an option. (Ex. 54, Doc. 26-37).

NW2 said he did not have problems with anyone other than Student 9. (NW2, Tr. 28). NW2 said he liked Hartung and liked being in her class. (NW2, Tr. 29). Plaintiffs echoed this

sentiment and said they felt Hartung was a great teacher and did a great job handing discipline. (Linda Vol. 1, Tr. 16; Ex. 8, Doc. 28-3). NW2 also said no one, including Student 9, ever teased or targeted him for being part-Cuban. (NW2, Tr. 31). He said he had learned a lot in second and third grades and formed good relationships with other kids. (NW2, Tr. 31-32).

Neither Janitzki nor Hartung ever characterized Student 9's behavior as bullying or intentional. (Janitzki, Tr. 46-51; Hartung, Tr. 36-37). Hartung explained, Student 9 "often chas[ed] kids because he wanted to play with someone outside at recess." (Hartung, Tr. 36). She also said NW2 would come to school happy every day and "was never afraid to be around [Student 9]." (Hartung, Tr. 37, 40). NW2 did not have any problems with Student 9 during fourth grade at Meadowlawn. (Linda Vol. 2, Tr. 243-44).

### Facts Pertaining to NW1

NW1 attended Meadowlawn in fifth grade and Briar for sixth and seventh grades. (NW1, Tr. 7). He now attends Lake Ridge Academy for high school where he plays golf, is involved in student clubs, and earns mostly A's. (NW1, Tr. 5-7). Principal Finn and Assistant Principal Quisno were employed at Briar at all times relevant to this action. Assistant Principal Quisno dealt with nearly all student conduct and discipline matters, although Finn occasionally assisted by interviewing students. (Finn, Tr. 17-18, 21-22).

### Fifth Grade (2008-2009)

During fifth grade, NW1 generally described incidents that occurred outside of school involving neighborhood sports with his friend, Student 1. (NW1, Tr. 13-17). NW1 and Student 1 lived in the same neighborhood and were friends growing up. (NW1, Tr. 13-15). However, in fifth grade their relationship began to change. (NW1, Tr. 17). According to NW1, he was smarter and this bothered Student 1, so Student 1 would get "extra competitive" when they played

9

together.  (NW1, Tr. 14-16). NW1 said his problems with Student 1 generally occurred in the neighborhood, not at school. (NW1, Tr. 16). Indeed, when asked whether he had any problems with Student 1 at school, he said "not many". (NW1, Tr. 16). NW1 said he talked about Student 1 to his teacher, Tammy Anderson ("Anderson"), "once or twice" but "she really didn't do anything about it." (NW1, Tr. 18). However, NW1 said Student 1 did not interfere with learning or his ability to enjoy things after school. (NW1, Tr. 17-18).

In October 2008, Linda emailed Anderson to inform her Student 1 pushed NW1. (Ex. 19, Doc. 26-2). Anderson replied that Student 1 said NW1 had pushed him, and after a lengthy discussion, it was discovered that Student 3 had pushed NW1. (Ex. 19, Doc. 26-2). Anderson indicated she would keep a closer eye on the situation to make sure it did not happen again. (Ex. 19, Doc. 26-2).

In another email, Linda reported that Student 6 was stealing items from NW1's desk. (Ex. 22, Doc. 26-5). Anderson replied that she moved the students' desks, requested NW1 to email her if he was having problems, and said she talked to the class about respectful behavior. (Ex. 22, Doc. 26-5).

In March 2009, Linda emailed Anderson her concerns about Student 1's rough behavior during recess and wanted to know if his parents had been contacted. (Ex. 27, Doc. 26-10). Anderson responded that she had been watching the students at recess and agreed that Student 1 was "rough when he play[ed] sports" but attributed this to him not understanding his own strength. (Ex. 27, Doc. 26-10). She said she would keep an eye on the situation. Linda responded that she just wanted Anderson to be aware of the situation. (Ex. 27, Doc. 26-10). She also expressed concern that Student 1 deliberately slammed into NW1 while they were playing basketball and she considered it "unnecessary roughness." (Ex. 27, Doc. 26-10).

10

Later that week, Linda emailed Anderson and requested a meeting to "discuss how we can all be proactive should the situation with Student 1 continue to escalate." (Ex. 28, Doc. 26-11). Anderson said she had been observing Student 1 and NW1 and had not noticed the boys having any problems. (Ex. 28, Doc. 26-11). To the contrary, she observed them talking and laughing during physical education. (Ex. 28, Doc. 26-11). Anderson also said she asked Janitzki if he had seen anything occur between the boys at recess; Janitzki said he had not but he would keep watching. (Ex. 28, Doc. 26-11). Anderson said, "I really don't know what I can do to help. Friendships change and the boys may be going through a change." (Ex. 28, Doc. 26-11). Nevertheless, she said she would continue to monitor the boys. (Ex. 28, Doc. 26-11).

Frustrated, Linda replied that she and her family had been dealing with this "on their own" since the year before. (Ex. 28, Doc. 26-11). Linda explained she asked NW1's friends about Student 1 and they responded that Student 1 was "mean to a lot of people, but he really target[ed] [NW1]." (Ex. 28, Doc. 26-11). Linda was concerned about Anderson's lack of communication with Student 1's parents and that her discipline of Student 1 was not effective. (Ex. 28, Doc. 26-11).  Linda requested that Anderson "continue to closely monitor their interaction, enforce the rules, and communicate with us and [Student 1's parents]." (Ex. 28, Doc. 26-11).

In another email, Linda explained to Anderson that she should "enforce the rules and dole out consequences" if she saw any rough behavior displayed by kids on the playground. (Ex. 29, Doc. 26-12). Linda also asked Anderson not to pull NW1 out in the hall to talk to him about the "situation" anymore because it made NW1 feel uncomfortable and was obvious to his classmates. (Ex. 29, Doc. 26-12).

11

In April 2009, Linda emailed Janitzki, summarized the incidents between NW1 and Student 1, and requested parents be informed if any physical behavior was directed toward NW1. (Ex. 31, Doc. 26-14).

Shortly thereafter, Anderson complied with Linda's request and emailed her about NW1 being pushed into the girls bathroom by Student 6. (Ex. 32, Doc. 26-15). Linda thanked Anderson and wondered whether the parents of Student 6 were contacted. (Ex. 32, Doc. 26-15). However, Linda said, "[i]t isn't our intention to call these kids parents because it seems like a small incident, but I do think its [sic] important for the school to inform them. Thank you for handing this decisively." (Ex. 32, Doc. 26-15).

**Sixth Grade (2009-2010)**

Before the school year began, Linda emailed Superintendent Gunner and expressed concern with how the District communicated with parents about "student misbehavior, student discipline, and even transmission of lice." (Ex. 36, Doc. 26-19). Linda said, "[m]ost of all, what seem[ed] to be lacking from the district [was] a clear vision for how educational professionals and parents can best function as partners in the education of students." (Ex. 36, Doc. 26-19). Gunner responded, addressed a variety of Linda's concerns, and set up a meeting to discuss her emails. (Ex. C, Doc. 29-1, at 2; Ex. 20, Doc. 26-20). Thus, in August 2009, Linda met with Gunner and discussed general communication concerns about misbehavior; however, the concept of "bullying" was not brought to Gunner's attention at that time. (Linda Vol. 1, Tr. 101-05; Gunner, Tr. 35-37).

At the beginning of each school year at Briar, Principal Finn or Assistant Principal Quisno instructed students about what they should do if they are being picked on, i.e., tell a teacher or adult, talk to a counselor, talk to Finn or Quisno, leave a note, tell a friend, etc. (Finn,

12

Tr. 49-51). In addition, every sixth grade student at Briar took a personal development class where diversity, acceptance, and bullying were discussed. (Finn, Tr. 11-12). Indeed, NW1 testified Ms. Ninke discussed bullying in her personal development class and told students to contact her if they ever had a problem. (NW1, Tr. 58-59).

Therome James ("James") was NW1's sixth grade homeroom and study skills teacher. James testified that he spent several weeks talking about bullying during study skills. (James, Tr. 22-25). The class watched videos on bullying and discussed them; and James required students to share stories of negative behavior that affected them and also gave them opportunities to discuss incidents privately. (James, Tr. 22-25). NW1 also recalled an anti-bullying presenter spoke to the school during seventh grade. (NW1, Tr. 95-96).

Plaintiffs' bullying allegations stem from incidents involving Students 12, 14, and M during sixth grade. A few weeks into sixth grade, Student 12, a black student, began whispering swear words in NW1's ear during class and calling him names like nerd, bookworm, faggot, bitch, gay wad, queer, and nigger. (NW1, Tr. 23-27). During the first six weeks of school, Student 12's behavior was mostly verbal and directed at NW1 and his friend, Student 31. (NW1, Tr. 27-28). Eventually, Student 12 began pushing, tripping, and body-checking NW1 into lockers. (NW1, Tr. 23-24, 26). Soon thereafter, Student 14 began participating in this behavior with Student 12. (NW1, Tr. 23-25). NW1 either ignored Student 12 or told him to shut-up; however, when these efforts failed he reported Student 12 to James, who said he would talk to him. (NW1, Tr. 29).

One time after class, NW1 told his math teacher Student 14 had been making fun of him when he raised his hand to answer questions. (NW1, Tr. 66-67). NW1 asked the teacher to move his seat, which she did and the behavior was reduced. (NW1, Tr. 67).

13

Another time, Student 12 tried to trip NW1 in social studies class and NW1 emailed Jennifer Mazza ("Mazza"), his teacher, to report the incident. (NW1, Tr. 65). Principal Finn was informed by email that Mazza had dealt with the problem involving Student 12 and another boy. (Finn, Tr. 62, 81, 92-96; Ex. 40, Doc. 26-23; Ex. 41, Doc. 26-24). Finn was not informed Mazza had previously penalized Student 12 for other classroom conduct. (Finn, Tr. 103).

On a Sunday evening in October 2009, Patrick called James at the sporting goods store where he worked part-time and told him about the conduct directed at NW1 by Students 12 and 14. (Patrick, Tr. 64). James immediately called Finn to inform him of Patrick's phone call. (Finn, Tr. 62-63). The next morning, Finn called Students 12 and 14 to his office and they admitted to the behavior. (Finn, Tr. 62-63, 97-100; Doc. 26-26). Assistant Principal Quisno disciplined both boys by issuing an extended school day. (Finn, Tr. 98; Ex. 43, Doc. 26-26).

That same day, Linda emailed Principal Finn and requested a meeting to discuss the "repeated abusive bullying behavior" NW1 was experiencing. (Ex. 42, Doc. 26-25). Finn replied and informed Linda that Students 12 and 14 admitted to the conduct and had been disciplined. (Ex. 43, Doc. 26-26). In the meantime, Linda emailed Superintendent Gunner on matters unrelated but noted, "my husband and I were very pleased at the prompt responsiveness of Mr. James and Mr. Finn from Briar re: some difficulties our son was having with another student." (Ex. C, Doc. 29-1).

Before a meeting was scheduled between Finn and Plaintiffs, NW1's situation at school climaxed when Student 12 punched him in the back during lunch. (NW1, Tr. 30-32). After lunch, NW1 walked to James' classroom to report the incident, during which Student 12 followed and berated him, yelling "oh bully, bully." (NW1, Tr. 33; Ex. A, Doc. 30-1, at 8). After reporting the

14

incident, James walked Student 12 to the office and NW1 went back to class. (NW1, Tr. 30-34). NW1 identified this as the worst thing that happened to him. (NW1, Tr. 76-77).

After meeting with Plaintiffs, Finn talked to NW1 and asked him to explain what had been happening at school. (Finn, Tr. 144-48; Ex. A, Doc. 30-1). NW1 wrote out a statement and discussed it with Finn. (Ex. A, Doc. 30-1, at 8). He said Student 12 cussed at him constantly – "says every cuss word from A-S" – and tripped and poked him for no reason. (Finn, Tr. 144-45; Ex. A, Doc. 30-1). Finn then talked with Student 12's father and called Student 12 into his office the next morning. (Finn, Tr. 144-48; Ex. A, Doc. 30-1). As the boys statements differed, Finn investigated further, and subsequently disciplined Student 12 by issuing a three day in-school suspension. (Finn, Tr. 67, 147; Ex. 55, Doc. 27-1). Finn informed Linda he had spoken with Student 12's father and he had been disciplined. (Finn, Tr. 126-27, 149-50; Ex. 49, Doc. 26-32; Ex. B, Doc. 30-2).

At that point, Linda and Patrick requested that the boys' schedules be adjusted so they were no longer in the same classes. (Finn, Tr. 68). When Finn suggested changing NW1's schedule, Plaintiffs objected, so Finn changed Student 12's schedule to minimize contact between the two boys. (Finn, Tr. 67-68). At his next meeting with the sixth grade class, Finn reminded all the students about appropriate behavior and discussed with staff the need to be aware and visible. (Finn, Tr. 85).

Up to this point, Plaintiffs had met with Principal Finn on Wednesday, November 11 2009, regarding the incident between Student 12 and NW1; Principal Janitzki on Thursday, November 12, 2009, regarding the biting incident with Student 9 and NW2; and finally, Superintendent Gunner on Friday, November 13, 2009, regarding the incident involving Student 9 and NW2.  (Linda Vol. 1, Tr. 172). Gunner recalls that Plaintiffs expressed general frustration

over multiple incidents with both boys. (Gunner, Tr. 30-37). He said Plaintiffs were concerned about the "overall atmosphere that their boys were being picked on and that [Janitzki] was not reacting in a way they felt was appropriate." (Gunner, Tr. 37-38). Plaintiffs also gave Gunner a copy of the Ohio Board of Education's bullying policy recommendations. (Linda Vol. 1, Tr. 173).

After the meeting, Patrick emailed Gunner that same night and said, "Mr. James has really stepped up and taken an interest in this situation. We believe that he followed through in every way that he could by taking [NW1] seriously and informing Mr. Quisno of [Student 12's] conduct. Why Student 12 was not given any significant consequences until Mr. Finn became involved and why we were not contacted by Mr. Quisno about the incident is a question that still needs to be answered." (Ex. C, Doc. 29-1).

Plaintiffs provided a written statement to police about the punching incident and on-going name-calling of NW1 by Student 12. (Finn, Tr. 128-29; Ex. 51, Doc. 26-34). Plaintiffs never showed a copy of the police statement to Finn. (Finn, Tr. 128-29). In the statement, Linda reported Student 12 verbally abused NW1 by calling him "fucking pussy, nigger, asshole, faggot, dickhead, bitch, etc." (Ex. 51, Doc. 26-34). Neither Plaintiffs' police statement nor NW1's written statement to Finn contain any allegation that NW1 was subjected to racial slurs by Student 12 based on his part-Cuban ethnicity. (Ex. 51, Doc. 26-34; Ex. A, 30-1, at 8).

After the schedule change, Student 12's behavior directed toward NW1 died down less some run-ins in the hallway; regardless, NW1 said Student 14 "picked up where Student 12 left off", as he continued to call NW1 names, including "dirty Cuban." (Doc. 39, at 2; NW1, Tr. 37,

16

40, 43, 45-46).[4] Toward the middle of the year, Student M began throwing trumpet valves at him during band class and also called him a "dirty Cuban." (NW1, Tr. 47-50). After a few weeks, Linda informed NW1's band teacher and Student M stopped throwing the valves. (NW1, Tr. 50). However, NW1 said Student M continued to whisper names in his ear. (NW1, Tr. 50).

NW1 testified that he only talked to Finn twice about Student 12's behavior. (NW1, Tr. 59-61). The first time, NW1 told Finn that Students 12 and 14 were body-checking him and calling him names, which Finn issued detentions for. (NW1, Tr. 60-61). The second time was the lunchroom punching incident, after which Student 12 was suspended and his schedule changed. (NW1, 60-64; Ex. 55, Doc. 27-1). Finn said he was never informed of another incident where NW1 was picked on during his sixth grade year. (Finn, Tr. 71, 84).

In general, NW1 said one or two teachers were in the hallway between class changes and three teachers were staffed the cafeteria during lunch. (NW1, Tr. 7-8). NW1 received very good grades in sixth grade, played basketball, and hung out with Students 27 and 31. (NW1, Tr. 12, 22, 89).

Overall, Linda and Patrick were distressed about the District's disciplinary process. (Ex. 26, 28, 29, 32; Docs. 26-9; 26-11, 26-12, 26-15). First, they took issue with how the District handled behavioral problems in terms of communicating with parents. (Ex. 28, 29, 32, 36, 42; Docs. 26-11, 26-12, 26-15, 26-19, 26-25). Namely, they felt both sets of parents should be contacted every time any physical altercation took place, including shoving in the hallways between classes. (Id.; Linda Vol. I, Tr. 30, 68, 74). Second, Plaintiffs took issue with how school

---

4. Initially, NW1 reported Student 12 body-checked him a total of ten times after the schedule change, five of which Student 14 participated in. (NW1, Tr. 54). However, after taking a break during his deposition NW1 was adamant about clarifying that Student 12 called him a nigger, hairy-ass Cuban, or bitch every day and pushed him into lockers "most days." (NW1, Tr. 55-56).

administrators disciplined students – specifically, that punishments issued by the school were not severe enough. (Linda Vol. I, Tr. 36, 46, 74; Ex. 44, Doc. 26-27). Indeed, on at least two occasions, Linda presented school officials with a copy of Ohio Department of Education's recommended behavioral policies. (Linda Vol. I, Tr. 160, 176).

In response to Plaintiffs' meeting with Gunner in November 2009, Gunner emailed Linda and Patrick in December 2009 to follow up with them "about [their] conversation regarding the law, district policy, and district practices regarding bullying." (Ex. C, Doc. 29-1, at 9). The District's definition of bullying coincided with Ohio Rev. Code § 3313.666 which states, in pertinent part:

> Bullying is an intentional written, verbal, or physical act that a student has exhibited toward another particular student more than once. The behavior caused both mental and physical harm to the other student and is sufficiently severe, persistent or pervasive that it creates an intimidating, threatening or abusive educational environment for the other student.

(Ex. F, Doc. 29-4, at 2).

Gunner explained that the regulations were up to date, but that the District had not been following the bullying policy on a regular basis to the extent that he had not been reporting bullying incidents bi-annually on the District's website. (Ex. C, Doc. 29-1, at 9). To remedy that, Gunner said he met with his administrative team and discussed policy reporting requirements and new communication practices. (Id.). Regarding the bullying policy, Gunner testified that if there was a complaint of bullying, the District was supposed to conduct a thorough investigation of the complaint. (Gunner, Tr. 15). The investigation was typically done by the building principal or assistant principal. (Gunner, Tr. 15). Based upon their investigation, they would take appropriate action if they felt it was warranted. (Gunner, Tr. 15-16). If they determined it was an issue of bullying, they would then bring it to the attention of the superintendent. (Gunner, Tr.

18

16). The superintendent then had the obligation to post the number of bullying incidents twice-annually on the district website. (Gunner, Tr. 16).

**Seventh Grade**

During the summer between sixth and seventh grades, a photo of Student 14 with NW1 in the background was posted on Student 14's Facebook page, along with some disparaging comments – "[NW1] UR A FAGET", "Gayyyyy…", "milky, milky fried rice", and "whos [sic] that homo in the back?" (Ex. 5, Doc. 24-4). Plaintiffs became aware of the post in October of 2010 when one of Linda's friends allegedly told her about it. (Linda Vol. 2, Tr. 246, 251). NW1 did not have a Facebook page and he had not seen the post. (NW1, Tr. 77; Patrick, Tr. 111-12). On Sunday, October 17, 2010, Linda and Patrick went to the police station to file a report about the Facebook post and asked Officer McLaughlin to call Principal Finn to meet them there. (Linda Vol. 2, Tr. 253-54). As Finn recalled, this was the first incident involving NW1 since Student 12 had punched him the year before. (Finn, Tr. 71-72).

When Plaintiffs showed Finn the Facebook posting, he could tell the photo had been taken at Briar, but noted the first posting was done in mid-summer and the other postings took place during the weekend. (Finn, Tr. 74). Finn also knew the school computers blocked Facebook, so the postings were not made on school computers. (Finn, Tr. 74).

Finn informed Superintendent Gunner and the two had a meeting with Officer McLaughlin, Assistant Principal Quisno, and school counselors the next day to review the posting. (Finn, Tr. 75). Based on the dates and lack of school computer involvement they determined it was a police matter, not a school matter. (Finn, Tr. 75).  Nevertheless, Finn called Student 14 into his office, issued an intent to suspend, asked him to make a statement, and made sure the posting was removed. (Finn, Tr. 165-66).

19

Officer McLaughlin also followed up with Student 14 and informed Plaintiffs he had done so. (Linda Vol. 2, Tr. 256). Plaintiffs wanted Officer McLaughlin to pursue prosecution of Student 14 for the Facebook post; however, Officer McLaughin informed them the prosecutor refused to do so because there was no threat. (Linda Vol. 2, Tr. 257, Finn, Tr. 165-66).

NW1 did not know about the Facebook post until his parents brought it to his attention. (Patrick, Tr. 111-12). After this time, according to his parents, NW1 experienced verbal feedback about the post. (Patrick, Tr. 112).

Prior to the Facebook incident, Linda said she could not recall reporting any incidents about bullying during NW1's seventh grade year. (Linda Vol. 2, Tr. 262-63). Likewise, NW1 testified seventh grade was smoother than sixth and "not many specific bullying things happened." (NW1, Tr. 84). Students 12, 14, and M were not in his lunch period or any of his classes during seventh grade. (NW1, Tr. 85). NW1 "thinks" Student 12 hit him one or two times in the hallway; however, he said he did not tell anybody about those incidents. (NW1, Tr. 85, 88). He also said no one whispered in his ear or called him names in class anymore. (NW1, Tr. 85-86).

However, independent of Students 12, 14, and M, one student called him "Castro" and said things about NW1 swimming here from Cuba. (NW1, Tr. 47). NW1 also said another student, who was not friends with Students 12, 14, or M, pushed him and said, "[s]hut the fuck up, you gay wad." (NW1, Tr. 86). NW1 did not report this incident. (NW1, Tr. 88).

Linda testified that in December 2010, during a parent teacher conference, she told NW1's language arts teacher he had been harassed during sixth grade and that it was still happening. (Linda Vol. 2, Tr. 259-60). The teacher was surprised because she had not heard of NW1 being bullied the prior year and she had not seen any incidents. (Linda Vol. 2, Tr. 259-60).

20

Linda admitted that from January 2011 to May 2011, she did not report any incidents of bullying to any school personnel. (Linda Vol. 2, Tr. 265-66). Moreover, despite Linda's allegation that name-calling by Students 12 and 14 continued, NW1 testified that people no longer whispered to him or called him names in class during seventh grade. (Linda Vol. 2, Tr. 258, *contra* NW1, Tr. 85, 87).

Principal Finn had no contact with Plaintiffs after the police station meeting regarding the Facebook post. (Finn, Tr. 77-79). He later became aware NW1 had not returned to school for eighth grade. (Finn, Tr. 77-79).

<u>**Academic Reports, Extracurricular Activities, Neighborhood Events**</u>

NW1 was a straight-A student in sixth and seventh grades and continues to perform well at his new school. (NW1, Tr. 70). Moreover, during sixth and seventh grades, NW1 was involved in one extracurricular activity each year. In sixth grade, he played basketball. (NW1, Tr. 88). However, NW1 heard a rumor Student 14 might join basketball in seventh grade so he chose to join the swim team instead. (NW1, Tr. 88-89).

NW1 saw two counselors. During part of sixth grade, he met "Poppy Lee" every three weeks. (NW1, Tr. 78-9; Linda Vol. 2, Tr. 300). After seventh grade, he saw Dr. Cielo a few times but mainly spoke with him about neighborhood happenings that he felt had a school connection. (NW1, Tr. 100-01).

Plaintiffs reported a series of neighborhood incidents to police including the egging of their home, kids ringing their doorbell and running away, and alleged vandalism after broken tree limbs were in their yard after a storm. (Ex., 64-67, Docs. 27-10, 27-11, 27-12, 26-13). Police reports showed Plaintiffs often blamed Student M, their neighbor, and sometimes other children, for these incidents. (Id.). The neighborhood events were not exclusively directed at Plaintiffs and

Student M was never charged for the incidents. (Id.). The reports also show Plaintiffs left accusatory notes throughout the neighborhood and confronted children they thought were responsible. (Id.; Linda Vol. 2, Tr. 289-90). Linda testified they made the decision to change schools after a derogatory remark was spray-painted on their house foundation and when Steve Schuster, their neighbor and Perkins school board member, confronted them in their shared neighborhood and called them "chronic complainers." (Linda Vol. 2, Tr. 277).

### STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file together with any affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file together with any affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Celotex*, 477 U.S. at 323.

Once the moving party meets this burden, the burden then shifts to the opposing party who "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be resolved by a jury." Fed.R.Civ. P. 56(e); *see also Vidovic v. Mentor City School Dist.*, 921 F. Supp. 2d 775,

790 (N.D. Ohio 2013). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson*, 477 U.S. at 248.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams*, 154 F. Supp. 2d at 1071. However, "at the summary judgment stage the [Court's] function is not [] to weigh the evidence and determine the truth of the matter," *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Ultimately, the Court is tasked with "the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact[.]" *Anderson*, 477 U.S. at 250.

However, the trial court does not have "a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). Rather, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

**DISCUSSION**

The key issue in this case is the overall adequacy of Defendants' response to confrontations or complaints of bullying. (*See*, Docs. 1, 39). Essentially, Plaintiffs' claim is that Defendants, both individually and as a District, failed to discipline students, implement bullying policies, and communicate with parents.

The avenue in which Plaintiffs bring their constitutional and federal claims is under 42 U.S.C. § 1983, which allows for relief when state actors deprive citizens of constitutional or federal rights. Plaintiffs also allege that their sons were subjected to racially motivated harassment and a hostile environment pursuant to Title VI of the Education Amendments of 1972, 42 U.S.C. § 2000d. (Doc. 39, at 33-34). Finally, Plaintiffs claim Defendants acted negligently for "failing to take reasonable steps to curtail the bullying, or at least find ways to move the boys out of harm's way." (Doc. 39, at 40).

Because Plaintiffs' Title VI claim shares the overlapping component of deliberate indifference with their § 1983 claims, the Court begins with their Title VI claim.

***Title VI Claim***

Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d, states that "[n]o person shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the rights of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Title VI does not impose liability against defendants in their individual capacities. *Fitzgerald v. Barnstable, Sch. Comm.*, 555 U.S. 246, 257 (2009). Therefore, at the outset, any individual claims against Defendants Gunner, Finn, and Janitzki should be dismissed.

Title IX of the Civil Rights Act is modeled after Title VI, such that the two operate in the same manner. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998); *Cannon v. Univ.*

24

*of Chicago*, 441 U.S. 677, 694-95 (1979) ("Title VI . . . is parallel to Title IX except that it prohibits race discrimination, not sex discrimination[.]").

Thus, a Title VI claim for harassment has three essential elements: 1) the racial harassment is "so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to educational opportunities or benefits provided by the school"; 2) the school had actual knowledge of the harassment; and 3) the funding recipient was deliberately indifferent to the harassment. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999)*; Patterson*, 551 F.3d at 444-45; *see also Vidovic*, 921 F. Supp. 2d at 796 n.10 (deliberate indifference standard in Title IX cases also applies to Title VI cases).

Here, Plaintiffs' Title VI claim fails because they cannot establish that the behavior directed at NW2 was racially motivated. Moreover, they cannot establish that NW1 was deprived of an educational opportunity or that Defendants were deliberately indifferent in their response to allegations and incidents of harassment.

**The Behavior Alleged Toward NW2 Was Not Racially Motivated**

Title VI prohibits discrimination on the basis of race. 42 U.S.C. § 2000d. There is simply no evidence in the record that NW2 was discriminated against or bullied based on race. Indeed, even NW2 testified that no one had ever called him names or teased him for being part-Cuban. (NW2, Tr. 31). Accordingly, NW2's Title VI claim should be dismissed for that reason.

**NW1 Was Not Deprived of an Educational Opportunity**

Damages for student-on-student harassment are only available when "the behavior is so severe, pervasive, and objectively offensive that it denies victims the equal access to education that Title IX is designed to protect." *Davis*, 526 U.S. at 652. Whether conduct rises to the level of actionable harassment "depends on a constellation of surrounding circumstances, expectations,

and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." *Id*. at 615 (quoting *Onacle v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 82 (1998)).

Courts "must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." *Davis*, 526 U.S. at 651. Thus, it is "understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." *Id*. Damages are not available "for simple acts of teasing and name-calling among school children" even when those comments target differences. *Id*. It is not enough that a student has been called "offensive names"; they must show persistence and severity as well. *Id*. at 652. To that end, the racial harassment must be so severe, pervasive, and objectively offensive that it "undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Id*. at 651.

In the leading Sixth Circuit case on student-on-student racial harassment, the court did not address whether the conduct was severe, pervasive, and objectively offensive, it merely accepted that it was. *Williams v. Port Huron Sch. Dist*., 455 F. App'x 612, 618 (6th Cir. 2012). In *Port Huron*, twelve black students, their parents, and black staff members were regularly called "niggers" or other racial slurs, and posters relaying racist messages were written on their lockers, including one that said "Death to all Niggers." *Id*. at 615. In addition, the principal discovered a text book littered with racist statements; the first page of the book said "KKK" and "I will kill all of you"; and the second page, entitled "Kill List", had a noose and a numbered list

of names which included several of the plaintiffs. *Id*. at 616-17. Moreover, the words, "I beat Niggers to death with these" was coupled with a second kill list located in the book. *Id*. at 617.

Under Title IX, the Sixth Circuit found a victim satisfied the severity and pervasiveness requirement when a fifth grade female student was called crude names, stabbed in the hand with a pen, and "propositioned or touched inappropriately in virtually every class." *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 256-59 (6th Cir. 2000). On one occasion, "two boys held her hands [down], while other students grabbed her hair and started yanking off her shirt. *Id*. at 256. When a boy stated he was going to have sex with her and began to take his pants off, another boy intervened and assisted [the student-victim.]" *Id*.

Similarly, the conduct in *Patterson* was found to meet the severe, pervasive standard when the plaintiff, a middle school student, was slapped by another student, teased by teachers, his gym locker vandalized and urinated in, and in ninth grade, "sexually assaulted by a fellow [baseball] teammate . . . in the locker room. [The perpetrator] stripped naked, forced [the plaintiff] into a corner, jumped on [his] shoulder, and rubbed his penis and scrotum on [the plaintiff's] neck and face. While the assault was occurring, another student . . . blocked the exit so [the plaintiff] could not escape." 551 F.3d at 442.

Important here, the conduct must also deprive a plaintiff of an educational opportunity. *Davis*, 526 U.S. at 653. In *Davis*, the plaintiff's right to educational access was violated when her "previously high grades allegedly dropped as she became unable to concentrate on her studies . . . [and] her father discovered that she had written a suicide note." *Id*. at 634. In *Patterson* the student withdrew from the school after the sexual assault. 551 F.3d at 443. Similarly, in *Vance*, the plaintiff withdrew from school and was diagnosed with depression. 231 F.3d at 251.

27

Here, the behavior directed at NW1, while offensive, does not rise to the level of severe and pervasive because NW1 was not deprived of an educational opportunity. While Plaintiffs sought counseling for NW1 on two occasions, NW1 maintained impeccable grades and was involved in an extracurricular activity each year. *Contra*, *Davis*, 526 U.S. at 634, 653 (standard met when plaintiff's previously high grades dropped as she became unable to concentrate and wrote a suicide note after sexual battery by harasser). Although NW1 joined the swim team because he heard a rumor Student 14 was trying out for basketball; this was not the type of "*systemic* effect . . . denying the victim equal access to an educational program or activity" that the Supreme Court intended. *Davis*, *supra*, at 652 (emphasis added).

Plaintiffs summarily allege they left the District because of bullying; however, Linda acknowledged she did not report any incidents of bullying in seventh grade other than the Facebook incident, which occurred outside of school, over the summer, and NW1 was not made aware of it until his parents brought it to his attention. Moreover, NW1 said seventh grade was unremarkable in terms of bullying incidents, except he "thinks" Student 12 hit him in the hallway once or twice, which he did not report.

Dispositive here, Linda testified they made the decision to change schools after a derogatory remark was spray-painted on their house foundation and when their neighbor, who happened to be a school board member, called them chronic complainers. These incidents, including the Facebook incident, simply cannot be attributed to the District for Title VI liability. *Davis*, 526 U.S. at 646 (the misconduct must occur "under" the "operation" of the funding recipient, i.e., during school hours and on school grounds).

**The District Was Not Deliberately Indifferent Toward NW1 or NW2**

Nevertheless, even assuming the behavior directed at NW1 did meet the severe and pervasive standard, Plaintiffs cannot show Defendants were deliberately indifferent to the conduct, racially motivated or otherwise, directed at NW1 or NW2.

In a harassment case, intent may be inferred when school officials' response to the harassment was deliberately indifferent. *See Davis*, 526 U.S. at 648. Therefore, Plaintiffs must show Defendants were deliberately indifferent to the allegations of racially-based student-on-student harassment. *Port Huron*, 455 F. App'x at 618; *Gant ex. rel. Gant v. Wallington Bd. of Educ.*, 195 F.3d 134, 1390-40 (2nd Cir. 1999). "The deliberate indifference, must, at a minimum, cause students to undergo harassment or make them more vulnerable to it." *Vance*, 231 F.3d at 260 (quoting *Davis*, 526 U.S. at 645).

"Deliberate indifference to discrimination can be shown from a defendant's actions or inactions in light of known circumstances." *Vance*, 231 F.3d at 260. "[A] plaintiff may demonstrate deliberate indifference to discrimination only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* (quoting *Davis*, 526 U.S. at 648).

The deliberate indifference standard "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment" or "expel[ling] every student accused of misconduct." *Vance*, 231 F.3d at 260 (quoting *Davis*, *supra*, at 648-49). A recipient is not required to "remedy" harassment; rather, "the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Davis*, *supra*, at 648-49. However, when a school "has knowledge that its remedial action is inadequate and ineffective, it is

29

required to take reasonable action in light of those circumstances to eliminate the behavior." *Vance*, 231 F.3d at 261.

In *Davis*, the Supreme Court suggested deliberate indifference could be found when the school failed to discipline the student harasser, separate the victim from the harasser, or establish a sexual harassment policy or procedure. *Vance*, 231 F.3d at 261 (citing *Davis*, *supra*, at 634-35).

The Sixth Circuit in *S.S. v. Eastern Kentucky University*, applying the *Davis* deliberate indifference standard in a disability case, found administrators were not deliberately indifferent because they responded to alleged incidents, conducted individual and group interviews with classmates, arranged outside speakers, talked about behavior in small groups or assemblies, monitored students, separated students, talked to police when necessary, disciplined students, and called students' parents to discuss disciplinary problems. 523 F.3d 445, 455 (6th Cir. 2008).

By contrast, the Sixth Circuit found deliberate indifference in *Patterson* when the "school district was made aware of pervasive verbal and physical student-on-student harassment over the span of four years . . .[and] responded mostly by verbally reprimanding the harassing students." *McCoy v. Bd. of Educ*. 515 F. App'x 387, 391 (6th Cir. 2013) (citing *Patterson*, 551 F.3d 448).

Moreover, the court found deliberate indifference in *Vance* after a female student was repeatedly exposed to verbal and physical harassment that increased in severity, culminating in an attempted sexual assault and repeated sexual propositions by fellow students. 231 F.3d at 256-57. "An investigation never occurred; instead, a teacher spoke with the students implicated in the harassment," in the presence of the victim. *McCoy*, 515 F.App'x at 392 (explaining its decision in *Vance*, 231 F.3d at 262).

Here, Defendants were not deliberately indifferent to the conduct directed at either NW1 or NW2. Concerning NW2, Plaintiffs argue Defendants were indifferent because they gave

30

Student 9 "the school equivalent of a disability pass." (Doc. 39, at 33). To the contrary, both Hartung and Jantizki communicated about Student 9's behavior, and responded to each instance involving Student 9's conduct. Hartung moved Student 9's seat at lunch; she had him stand in the front or back of the line when changing rooms; and she sat him near her in the classroom. Indeed, even Plaintiffs concede Hartung was "wonderful, and she [had] done everything she possibly [could] to thwart his acting out." (Doc. 28-3).

Likewise, Janitzki responded to general complaints of rough behavior on the playground by assigning a second aide, and he addressed Student 9 directly by including him in a presentation about behavior. Moreover, in response to the biting incident, Janitzki suspended Student 9 and subsequently requested and received a full-time aide for him. Notably, after these measures were taken, Student 9 never touched NW2 again.

Concerning NW1, Plaintiffs argue Defendants were deliberately indifferent because they "failed to make written reports and written investigations" (Doc. 39, at 31); failed to expel Student 12 or define his behavior as bullying (Doc. 39, at 33); and "failed to properly address the situation over the course of several years at two different schools" (Doc. 39, at 35).

In fifth grade, Linda emailed Anderson on numerous occasions to request that she monitor Student 1 because he was "unnecessarily rough", a request Anderson complied with. While the evidence shows Plaintiffs may not have been pleased with the school's approach to discipline, Anderson's response of monitoring the boys, asking Janitzki to monitor the boys, and communicating with Plaintiffs and NW1 about the behavior was not unreasonable. There is also no evidence the alleged "unnecessary roughness" by Student 1 was ongoing during fifth grade. Indeed, NW1 testified "not many" incidents occurred with Student 1 at school. (NW1, Tr. 16).

31

Moreover, there is no evidence to suggest Student 1's "competitive" behavior continued after fifth grade.

In sixth grade, Finn and Quisno started out the year informing students about various options they could take if they were being picked on. Moreover, bullying was discussed in James' study skills class and Ninke's personal development class. Despite these prevention efforts, Student 12 began picking on NW1. Shortly after, Students 14 and M joined in. However, each time behavior directed at NW1 was reported, the offending students were progressively disciplined.

The first time Plaintiffs reported conduct directed toward NW1, Students 12 and 14 were called to Finn's office and given detentions. Notably, in an email to Gunner, Linda expressed approval with how James and Finn handled the situation. Unfortunately, the behavior did not subside, and Student 12 punched NW1 in the back shortly after he had been disciplined for the prior incident. NW1 identified this as the worst thing that happened to him. Finn investigated the incident by interviewing NW1, Student 12, and various classmates, and taking written statements. Subsequently, Finn gave Student 12 a three day in-school suspension and rearranged his class schedule so he was no longer in contact with NW1.

Plaintiffs were in constant communication with the school. In addition, Finn contacted Student 12's parents regarding the punching incident. Plaintiffs were also in contact with and met Gunner on numerous occasions. Indeed, when Plaintiffs expressed concern that the District was not in compliance with the Ohio Board of Education's bullying recommendations, Gunner promptly responded, met with administrators, and followed up with Plaintiffs via email.

Contrary to Plaintiffs' assertions, Defendants did not turn a blind eye. Rather, the District took steps in response to the acts of alleged perpetrators. Those steps were progressive, with the

consequences becoming more severe, particularly with respect to Student 12 when his offenses continued. *Doe v. Big Walnut Local School Dist. Bd. of Educ.*, 837 F. Supp. 2d 742, 751 (S.D. Ohio 2011) (no deliberate indifference when school took proactive and affirmative steps to address inappropriate conduct directed at plaintiff by meeting with parents regularly, disciplining offending students, involving police when necessary, and instituting a mutli-faceted safety plan); *contra*, *Patterson*, 551 F.3d at 448 (over the course of several years the school became aware verbal reprimands failed to stop the overall harassment of student-victim, which culminated in sexual assault). Here, the District's effort to combat the behavior against NW1 was not limited to verbal reprimands; rather the school issued detentions, suspensions, communicated with parents, interviewed students, and changed class schedules. Notably, these efforts worked. Plaintiffs did not report any incidents of bullying directed at NW1 during seventh grade.

While there were no reported incidents of misconduct *at school* directed toward NW1; Linda did discover some disparaging Facebook comments about NW1 written over the summer months. Finn met Plaintiffs at the police station to discuss the matter; and subsequently, Gunner, Finn, Officer McLaughlin, and school counselors met and determined it was a police matter, not a school matter. Despite this, Finn talked to Student 14, issued an intent-to-suspend, and made sure the post was removed.

Much in line with *S.S. v. Eastern Kentucky University*, where deliberate indifference was not found, Defendants responded to incidents and conducted individual and group interviews with classmates, arranged outside speakers, talked about behavior in small groups or assemblies, monitored students, separated students, disciplined students, and called students' parents to discuss disciplinary problems. 523 F.3d 445, 455 (6th Cir. 2008).

Likewise, there is simply no support for Plaintiffs' claim that the District should have expelled Student 12. As Defendants point out, Student 12 is protected by various state and federal laws, including expulsion due process requirements of Ohio Rev. Code § 3313.66. Indeed, in *Davis*, the Supreme Court found it "entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory clams." *Davis*, *supra*, at 648-49. Moreover, the deliberate indifference standard does not require districts to "expel every student accused of misconduct" in order to escape liability. *Vance*, 231 F.3d at 260. In any event, as noted above, the discipline imposed by the District successfully thwarted Student 12's behavior toward NW1. By seventh grade, the behavior directed toward NW1 ceased, less two slapping incidents he "thinks" happened but did not report to school administrators.

Finally, Plaintiffs claim that Defendants should incur some type of liability for not following their own internal bullying policies is equally unpersuasive. Ohio Rev. Code § 3313 requires school boards to establish an anti-bullying policy; however, the legislature went out of its way to specify that it does not create a new cause of action or substantive legal right. *See* Ohio Rev. Code § 3313.666(G).

Here, Defendants' response to behavior directed at NW1 and NW2 was appropriate and effective, and certainly not "unreasonable in light of the known circumstances." *Vance*, 231 F.3d at 260.

### *§ 1983 Claims*

Plaintiffs bring their constitutional and federal claims under 42 U.S.C. § 1983, which authorizes relief when a person acting "under color of any [state] statute" deprives an individual of a constitutional or federal right. *Doe v. Claiborne Cnty*, 103 F.3d 495, 505-06 (6th Cir. 1996);

34

*Gomez v. Toledo*, 446 U.S. 635, 638 (1980); (Doc. 39, at 22-33, 35-39). A suit against an individual in his official capacity for damages is "no different than a suit against the state itself," and is subject to the same legal analysis. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

**<u>Substantive Due Process</u>**

Plaintiffs allege that Defendants, acting under the color of state law, deprived them of their substantive and procedural due process right to familial association, including the right to control their children's education. (Doc. 1, ¶37). They also allege Defendants deprived NW1 and NW2 of their right to life, liberty, and the pursuit of happiness, as well as their right to familial relationships and their right to an education. (Doc. 1, ¶37).

The Due Process Clause of the Fourteenth Amendment protects an individual's life, liberty, and property against government actions. *Daniels v. Williams*, 474 U.S. 327, 331 (1986). The Clause has substantive and procedural components – "substantive due process prohibits the government's abuse of power or its use for the purpose of oppression, and procedural due process prohibits arbitrary and unfair deprivations of protected life, liberty, or property interests without procedural safe guards." *Howard v. Grinage*, 82 F.3d 1343, 1350 (6th Cir. 1996).

The substantive component protects "fundamental rights otherwise not explicitly protected by the Bill of Rights" and serves "as a limitation on official misconduct which, although not infringing on a fundamental right," is so oppressive that it shocks the conscience. *Id*. at 1349; *Doe v. Big Walnut*, 837 F. Supp. 2d at 751 (quotations omitted).

Generally, substantive due process does not impose a constitutional duty on a school to protect students from harm inflicted by private actors, such as their classmates. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989); *Vidovic*, 921 F. Supp. 2d at

35

791. However, "in certain limited circumstances the Constitution imposes upon the [s]tate affirmative duties of care and protection with respect to particular individuals." *DeSahaney*, 489 U.S. at 198.

Therefore, absent one of two exceptions, "it is not a constitutional violation for a state actor to . . . fail to rescue those in need," and the state has no constitutional duty to protect or rescue its citizens. *Vidovic,* 921 F.Supp.2d at 791 (citing *Peete v. Metro Gov't*, 486 F.3d 217, 223 (6th Cir. 2007) (quotations omitted). Exceptions apply when: 1) the state has custody of the person in need or some other "special relationship" that heightens their responsibility to care for a particular citizen; or 2) when a state actor acts affirmatively to create or greatly increases the risk of harm to its citizens. *DeShaney*, 489 U.S. at 195.

Plaintiffs concede the first exception does not apply here, but argue the second exception, known as the "state-created danger theory", does apply because the Defendants "knew NW1 and NW2 were being bullied . . . yet failed to take any actions to curtail the bullying." (Doc. 39, at 25).

Under the state-created danger theory, liability may be assessed to the state "if it caused or greatly increased the risk of harm to its citizens." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1988). The state-created danger exception applies when: 1) there is an affirmative act by the state which either created or increased the risk that plaintiff would be exposed to an act of violence by a third party; 2) there is a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and 3) the state knew or should have known that its actions specifically endangered the plaintiff. *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006). "This is a particularly demanding standard requiring that the state's affirmative action exposed the plaintiff

36

to a danger she wasn't already subject to." *Vidovic*, 921 F. Supp. 2d at 792 (citing *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 910-11, 913 (6th Cir. 1995)).

"Liability under the state-created danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." *McQueen*, 433 F.3d at 464 (quoting *Kallstrom*, 136 F.3d at 1066). Some courts find it difficult, in the abstract, to characterize whether conduct constitutes an affirmative act or failure to act. *Walker v. Detroit Public Sch. Dist.*, 2013 WL 4515996, at *3 (6th Cir. 2013). The distinction is important because an omission or failure to act will not support a state-created danger exception. *Jones*, 438 F.3d at 691. Here, however, the characterization of Defendants' alleged conduct is not difficult. Rather, it is clear that Plaintiffs' argument is premised entirely on Defendants explicit failure to act: Defendants "failed to take any action to curtail the bullying"; "turn[ed] a blind eye"; "fail[ed] to notify"; "dropped the ball"; "fail[ed] to properly define, investigate, [and] report . . . bullying") (Doc. 39, at 25-31).

Therefore, the line of cases most applicable to the situation here are those in which the state officials failed to act, failed to communicate, or failed to implement policies to protect students, which conclusively hold a failure to act is not an affirmative act for purposes of liability under the state-created danger exception. *See, e.g., Vidovic*, 921 F. Supp. 2d at 792 (failing to prevent bullying is not an affirmative act; "the school had no constitutional duty to protect or rescue [victim] from harm imposed by other students, or by her own hand."); *Sargi*, 70 F.3d at 912–13 (failing to provide bus drivers with a plan for managing emergencies, taking seizure victim home without medical intervention, failing to maintain communication devices on a bus, and failing to tell the bus driver of the student's medical condition were not affirmative acts); *Schroder v. City of Fort Thomas*, 412 F.3d 724, 728-729 (6th Cir. 2005) (failing to respond to

37

parental complaints about the lack of enforcement of a residential speed limit in a specific neighborhood was not an affirmative act); *Reed v. Knox County Dep't of Human Servs.,* 968 F. Supp. 1212, 1220–22 (S.D. Ohio 1997) (failing to inform family of foster child's violent history, placing child in home, and failing to remove child were not affirmative acts).

Plaintiffs also claim Defendants failed to "adequately and progressively" discipline the perpetrators. (Doc. 39, at 25, 27). To the extent Plaintiffs claim that Defendants' allegedly "inadequate" interventions constituted an affirmative act, they are incorrect. When an official intervenes to protect a person, then later returns the person to "a situation with a preexisting danger," the intervention does not satisfy the affirmative act requirement for state-created danger. *Bukowski v. City of Akron*, 326 F.3d 702, 709 (6th Cir. 2003); *see also McQueen*, 433 F.3d at 466 (There is no affirmative act where "the victim would have been in the same or even greater danger even if the state officials had done nothing.").

To the extent Plaintiffs argue "excusing the bullying behavior" or "defining the conduct as outside the scope of bullying" are affirmative acts, they are incorrect. The Sixth Circuit notes that in cases where it is difficult to determine whether the alleged conduct should be treated as a failure to act or action, the proper determination should be failure to act when the alleged conduct does not create or increase the risk of peril. *Patterson ex. rel. Estate of Turner v. City of Detroit,* 2008 WL 4858440, at *5 (E.D. Mich) (citing *Jones*, 438 F.3d at 692). As these cases indicate, when the state action or inaction "neither increase[s] [the victim's] risk of harm, nor render[s] [him] more vulnerable," the plaintiff cannot establish a cognizable affirmative act. *Sargi*, 70 F.3d at 913.

Here, there is no evidence to suggest that Defendants' disciplinary process affirmatively created or increased a risk of harm to NW1 or NW2. Rather, the evidence shows Defendants

38

continually responded and disciplined students who allegedly bullied NW1 and NW2. Indeed, after Defendants assigned a full-time aide to Student 9, he never touched NW2 again. Moreover, after NW1 reported Students 12 and 14, they were given detentions; and after Student 12 retaliated, he was suspended and his class schedule was changed. Indeed, every time conduct was reported, Defendants reacted and attempted to solve situations. Defendants' disciplinary decisions can hardly be categorized, in the abstract, as creating or increasing a risk of harm. The evidence clearly shows progressive effort on Defendants part to keep NW1 and NW2 out of harm's way.

Both the Supreme Court and the Sixth Circuit have repeatedly held that failure to act, even with knowledge that a risk of harm may exist without state intervention, is not enough to confer liability under the Fourteenth Amendment. *Vidovic*, 921 F.Supp.2d at 792 (citing *DeShaney*, 489 U.S. at 197); *Schroeder v. City of Fort Thomas*, 412 F.3d 724, 728-29 (6th Cir. 2005); *Weeks v. Portage Cnty. Exec. Offices*, 235 F.3d 275 (6th Cir. 2000). Because Plaintiffs' lawsuit is based on allegations that the District failed to adequately discipline or intervene when NW1 and NW2 were bullied, the state-created danger exception does not apply and their substantive due process claim fails.

Plaintiffs improperly rely on *S.S. v. Eastern Kentucky University* to assert that Defendants were deliberately indifferent and therefore, the state-created danger exception applies. (Doc. 39, at 27-29). However, Plaintiffs fail to acknowledge the court in *S.S. v. Eastern Kentucky University*, a case similar to the one at bar, found that the plaintiff "had failed to show an affirmative act by [Defendants] that created due process liability." 532 F.3d at 456.

Similarly unpersuasive is Plaintiffs reliance upon *Doe v. Big Walnut*, 837 F. Supp. 2d 742. In *Doe*, the court skipped the affirmative act prong and decided the plaintiffs' substantive

39

due process claim failed at the third factor of the state-created danger exception. *Doe*, 837 F.3d at 753 ("Even if there were a genuine issue of material fact with respect to the first two elements of the state-created danger exception, there is no evidence that Defendants acted with deliberate indifference.").

Plaintiffs also rely on *Shively v. Green Local School District Board of Education*, which is an order granting in part and denying part the defendants' motion for judgment on the pleadings. 2013 WL 774643 (N.D. Ohio). However, in that case, the court simply found plaintiffs had stated a claim under a state-created danger exception, not that plaintiffs had established an evidentiary record showing the existence of a genuine issue of material fact on the essential elements of their claim in a summary judgment context. *Shively*, *supra*, at *1, *4.

Plaintiffs have failed to cite any case law which supports their position that failing to curtail bullying rises to the level of an affirmative act under the state-created danger theory. Moreover, like *Doe* and *Eastern Kentucky*, even if there were a genuine issue of material fact with respect to whether Defendants' actions were affirmative, which there is not, there is no evidence that Defendants acted with deliberate indifference toward NW1 or NW2, as set forth above in the analysis of Plaintiffs' Title VI claim. *Doe v. Big Walnut*, 837 F. Supp. 2d at 753.

**Procedural Due Process**

To state a claim for failure to provide procedural due process, a plaintiff must allege: 1) he has a life, liberty, or property interest protected by the Due Process Clause; 2) he was deprived of this protected interest within the meaning of the Clause; and 3) the state did not afford him adequate procedural rights prior to depriving him of that protected interest. *Gunasekera v. Irwin*, 551 F.3d 461, 467 (6th Cir. 2009).

Plaintiffs' familial association claim fails because they have not alleged loss or separation of custody. While parents have a fundamental liberty interest in the care, custody, and control of their children, *Troxel v. Granville*, 530 U.S. 57, 65 (2000), there must be a loss of custody or a separation between the parent and child for there to be a constitutional violation, *Barrett v. Steubenville City Schools*, 388 F.3d 967, 972 (6th Cir. 2004).

Plaintiffs also argue their procedural due process rights were violated "when Dr. and Mrs. Waters . . . had to take their boys out of the Perkins school and transfer them to a private school." (Doc. 39, at 30). Plaintiffs cite *Shively* to argue that courts have recognized a direct constitutional claim by parents to educate their children. *Shively*, *supra*, at *8 ("Parents direct claim for deprivation of their right to educate their daughter when T.S. transferred to another public school remains pending at this time."). Again, *Shively* is not persuasive here as the case was partially dismissed based on a 12(b)(6) motion, not a motion for summary judgment. *Id*. Moreover, the "right to attend public school is not a fundamental right for the purposes of due process analysis." *Seal v. Morgan*, 229 F.3d. 567, 575 (6th Cir. 2000) (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33-37 (1973)).

Plaintiffs have only argued violation of their parental rights to familial relations and education under their procedural due process claim. (Doc. 39, at 29-30). However, to the extent they allege deprivation of such rights on behalf of their children, these claims also fail. Simply stated, "[t]he Constitution does not require the state to implement procedures . . . to protect [individuals] against a deprivation of rights by a third party, non-state actor." *Vidovic*, 921 F. Supp. 2d at 793.

41

**Equal Protection**

To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor "intentionally discriminated against the plaintiff because of membership in a protected class." *LRL Properties v. Portage Metro. Hous. Auth.*, 55 F.3d 1097, 1111 (6th Cir. 1995). To that end, Plaintiffs must demonstrate Defendants' racially discriminatory intent with respect to their response to the student on student harassment. *Williams v. Port Huron*, 455 F. App'x at 618; *Gant ex. rel. Gant v. Wallington Bd. of Educ.*, 195 F.3d 134, 1390-40 (2nd Cir. 1999). Thus, Plaintiffs must show Defendants were deliberately indifferent to the allegations of racially-based student-on-student harassment. *Williams v. Port Huron*, 455 F. App'x at 618.

The "deliberate indifference" standard for use in [equal protection] cases is 'substantially the same' as the deliberate indifference standard applied by the Sixth Circuit to Title IX cases, and in turn, Title VI cases. *Port Huron*, 455 F. App'x at 618 (quoting *Williams v. Paint Valley*, 400 F.3d at 369); *Davis*, 526 U.S. at 642. Therefore, the Court's deliberate indifference analysis in the Title VI section above applies here as well.

As thoroughly explained in the Title VI analysis, Plaintiffs cannot establish NW2 was discriminated against based on race. Moreover, Plaintiffs have failed to show school officials were deliberately indifferent to racially-based discrimination as to either child. Accordingly, Plaintiffs have failed to state a plausible claim under the Equal Protection Clause.

**_Monell_ "Custom or Policy" Claim**

The Board will not be held liable unless Plaintiffs can establish "that an officially executed policy, or the toleration of a custom within the school district leads to, causes, or results from the deprivation of a constitutionally protected right." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Doe v. Claiborne Cnty.*, 103 F.3d at 507. Plaintiffs cannot base their claim

42

against the District solely on the actions of school employees, as there is no respondeat superior liability under § 1983. *Monell*, 436 U.S. at 691.

A "policy" is a "deliberate choice to follow a course of action [] made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). A "custom" is a practice so permanent and well settled as to constitute a custom or usage with the force of law." *Feliciano v. City of Cleveland*, 988 F.2d 649, 654-55 (6th Cir. 1993).

Where, as in this case, a plaintiffs' theory of liability is one of deliberate indifference, or failure to act, an inaction theory must be established by: "1) the existence of a clear and persistent pattern of [conduct which deprived plaintiff of a federal right]; 2) notice or constructive notice on the part of the [s]chool [b]oard; 3) the [s]chool [b]oard's tacit approval of the unconstitutional conduct, such that its deliberate indifference in failing to act can be said to amount to an official policy of inaction; and 4) that the [s]chool [b]oard's custom was the moving force or direct causal link in the constitutional deprivation." *Doe v. Claiborne*, 103 F.3d at 508.

Here, Plaintiffs allege the Board "turned a blind eye to NW1 and NW2"; violated its own bullying policies; and "improperly trained its staff." (Doc. 38, at 37-38).

Much like the case at bar, in *Doe v. Big Walnut*, a student's parents felt more should have been done despite school administrators' efforts to stop harassment directed against their son. 837 F. Supp. 2d 742. However, the court rejected the plaintiffs' attempt to establish a custom or policy arising from inaction, holding that the school was not liable because they attempted to resolve the bullying by changing students' schedules, assigning a teacher's aide, monitoring behavior, and allowing the student-victim to leave class early. 837 F. Supp. 2d at 755-56.

43

Here, much like *Doe v. Big Walnut*, there is simply no evidence school administrators turned a blind eye to behavior directed at NW1 or NW2. Concerning NW2, Plaintiffs allege the "laxity regarding Student 9 amounts to an official policy or custom." (Doc. 38, at 38). However, despite Plaintiffs' conclusory statement, the evidence shows Hartung and Janitzki consistently monitored Student 9, a disabled student with social problems. Moreover, Janitzki assigned a second playground monitor after Linda complained the playground was too rough. And after the biting incident, Janitzki assigned a full-time aide to Student 9 and he never touched NW2 again.

Likewise, there is no evidence school administrators ignored behavior directed at NW1, or that failure to characterize behavior directed at NW1 as bullying was deliberately indifferent. *Doe v. Claiborne*, 103 F.3d at 508 ("[Deliberate indifference in this context does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference to [] abuse."). Here, the evidence shows Defendants successfully resolved the issues NW1 was facing by disciplining students, investigating incidents, changing Student 12's schedule, responding to emails, and meeting with Plaintiffs on multiple occasions. Indeed, the school's efforts to combat behavior directed at NW1 was by all means a success – by seventh grade no "bullying" incidents were reported at school.

The Court cannot impose liability against a school district simply because parents are unhappy with school communication or internal discipline. *Doe v. Big Walnut*, 837 F. Supp. 2d at 754-56. Simply stated, parental dissatisfaction does not create a genuine issue of material fact absent a clear and persistent pattern of abuse or deliberate indifference toward harassing behavior, as more fully explained in the Title VI above.

Finally, "liability is imposed on a political entity only where the policy itself is unconstitutional." *Doe v. Big Walnut*, 837 F. Supp. 2d at 755 (citing *Mann v. Helmig*, 289 F.

App'x 845, 851 (6th Cir. 2008)). There is no evidence that the Board's anti-bullying policies were unconstitutional. Important here, even assuming school employees somehow acted contrary to the Board's anti-bullying policies, the District cannot be held liable for such behavior because the alleged action would be a departure from the Board's adopted policies. *See Doe v. Big Walnut*, 837 F. Supp. 2d at 755.

Accordingly, there is no evidence of a clear pattern of inaction or abuse by any school employees. *See Doe v. Big Walnut*, 837 F. Supp. 2d at 755. Nor is there any evidence that the Board tacitly approved alleged unconstitutional conduct or acted with deliberate indifference. Based on the aforementioned, Defendants are entitled to summary judgment on Plaintiffs' *Monell* "custom or policy" claim.

**Individual Capacity and Qualified Immunity**

The Court now addresses Plaintiffs' individual capacity claims. Plaintiffs make the same arguments they offered to support their official capacity claims: that Defendants had a duty to protect NW1 and NW2, and Defendants were deliberately indifferent to nationality-based student-on-student harassment. (Doc. 39, at 41-42). Plaintiffs claim Defendants' inaction subject them to liability.

"Personal capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *Ky v. Graham*, 473 U.S. 159, 165 (1985). To prevail the plaintiff must show "the official, acting under color of state law, caused the deprivation of a federal right." *Id*. at 166; *see also* 42 U.S.C. §1983.

The Court fully incorporates its discussion regarding Plaintiffs' constitutional and federal statutory claims herein. For the same reasons set forth in the those sections, Plaintiffs cannot create a genuine issue of material fact that Defendants engaged in any conduct which caused a

deprivation of Plaintiffs' protected rights. Accordingly, Plaintiffs' claims against the individual Defendants fail for that reason. Moreover, because Plaintiffs cannot maintain a federal cause of action against the individual Defendants, "we have no need to reach the question of qualified immunity." *Doe v. Claiborne*, 103 F. 3d at 512-13.

### *State Negligence*

Plaintiffs concede Defendant Board is immune from state negligence liability because operating a system of public education is a governmental function to which no exception to immunity applies. Ohio Rev. Code § 2744.01(C)(2)(c). However, Plaintiffs argue Defendants Gunner, Finn, and Janitzki are liable because they breached a duty of reasonable care owed to the NW1 and NW2 by "failing to take reasonable steps to curtail the bullying, or at least find ways to move the boys out of harm's way." (Doc. 39, at 39-40).

A governmental employee is immune from state law claims unless: 1) his "acts or omissions were manifestly outside the scope of his employment or official responsibilities," or 2) he acted "with malicious purpose, in bad faith, or in a wanton and reckless manner." Ohio Rev. Code 2744.03(A)(6). Notably, the standard for demonstrating such conduct is high. *Shadoan v. Summit Cnty. Children Servs. Bd*., 2003 Ohio 5775, at ¶14 (Ohio App. Ct. 2000). "Thus, summary judgment is appropriate in instances where one's actions show that he did not intend to cause any harm, did not breach a known duty through ulterior motive or ill will, and did not have dishonest purpose." *Id*. (internal quotations omitted).

Plaintiffs summarily conclude Defendants breached their duty by failing to adhere to Board policies, develop a written safety plan, and communicate with Plaintiffs. (Doc. 39, at 40). Simply stated, Plaintiffs cannot show Defendants acted with the necessary mental state or outside the scope of their employment with the District. As more thoroughly discussed by the Court in

46

its deliberate indifference analysis, Defendants acted progressively to prevent and deter behavior directed at the boys. Plaintiffs simply fail to allege or point to any evidence showing that any of the individual Defendants acted with dishonest purpose or ill will.

### CONCLUSION AND RECOMMENDATION

Because no genuine issues of material fact exist on any of Plaintiffs' claims, the undersigned recommends Defendants' Motion for Summary Judgment be granted and Plaintiffs' Complaint be dismissed in its entirety.

s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).